UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CLIFFORD A. REYNOLDS,

      Plaintiff,

                                                      Civil No. 07-13103
                                                     Hon. John Feikens

      v.

THE LAFAYETTE LIFE INSURANCE
COMPANY, a foreign corporation,

      Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND DENYING PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

This case arises from Plaintiff Clifford Reynolds' (Reynolds) claim for Long Term Disability (LTD) benefits from Defendant Lafayette Life Insurance (Lafayette). I now have before me Defendant Lafayette's Motion for Judgment on the Administrative Record and Plaintiff Reynolds' Cross Motion for Summary Judgment. For the reasons cited below, I GRANT Defendant's Motion for Judgement on the Administrative Record, and DENY Plaintiff's Cross Motion for Summary Judgment.

**I.    FACTUAL BACKGROUND**

Between 2000 and 2003, Reynolds worked for the L'anse Creuse Public School System (the School System) as a computer technician.[1] Late in 2002, Reynolds began experiencing

---

[1] Reynolds provided technical support for the school system's network equipment, network operating systems, workstations, printers, telephone systems, and

severe chest pains, tightness, and pressure in his chest. This began a period of difficult health problems for Reynolds. His last day of work with the School System was December 11, 2003. On that day he was diagnosed with pneumonia, pulmonary infiltrates and pericarditis and remained hospitalized for more than two weeks.[2]

### A. Long Term Disability and Plan Provisions

As a result, Reynolds was approved for LTD benefits from Lafayette on March 10, 2004. However, the LTD policy set up two stages of determination. The first stage called for Reynolds to demonstrate that he was disabled from performing duties in his own occupation:

> During the First Stage of each period of continuous, Total Disability means an Insured Employee's inability, as a result of Sickness or Bodily Injury, to perform with reasonable continuity the material and substantial duties of His or Her Own Occupation.

This stage allowed Reynolds to receive LTD benefits for up to 24 months. After that, the LTD policy stated Reynolds could receive LTD benefits if he established that he was disabled from working in any occupation because of the causes that led to his initial disability:

> The Second Stage is a continuing period of Total Disability that has the same cause(s) of Total Disability as the First Stage. The Second Stage starts as soon as the First Stage expires. During the Second Stage, Total Disability means an Insured Employee's inability, as a result of Sickness or Bodily Injury, to perform with reasonable continuity the material and substantial duties of His or Her Own Occupation and any other occupation for which he or she is or becomes reasonably fitted by education, training, experience, age, and physical and mental capacity.

Obviously, the Second Stage was more stringent since it allowed for a greater set of work

---

email. Occasionally, Reynolds was required to move desks, workstations, computers, monitors, and printers for repair and service.

[2] A pulmonary infiltrate is the filling of air space with fluid, white cells or pus, or other cells (red blood cells, hemorrhages, malignant cells, etc.) that fill a region of the lung. Pericarditis is an inflamation of the membrane that surrounds the heart. Both conditions can be life threatening.

options than the First Stage.  Under the terms of the LTD policy, the determination of whether Reynolds was qualified for either stage rested in the claim administrator's discretion.  To the extent benefits were paid, they were subject to reduction if Reynolds received other income, including "[a]ny amount the Insured Employee [his or her dependents or any other persons] receives because of the Employee's disability . . . under Social Security."  The LTD policy was clear that Social Security disability income could result in Reynolds having to pay back LTD benefits if there was an overpayment.

      **B.**     **Reynolds' Medical History During Disability**

Reynolds listed three treating physicians: (1) Dr. Theodore Schreiber (Cardiology); (2) Dr. Hershel Sandberg (Internal Medicine); and (3) Dr. Marc Dunn (lung disease).  Schreiber signed the physicians statement that accompanied Reynolds' LTD benefits application.  Schreiber diagnosed Reynolds as having pericarditis and pulmonary infiltrates/pneumonia. The illnesses limited Reynolds' ability to stand, climb stairs, or lift items that weighed between 10-15 pounds.  Reynolds was also limited in his ability to work for more than 30 minutes at a time and pull on light items.  However, he could sit, drive and use a keyboard without difficulty.

Schreiber also submitted a Physical Capacities Evaluation Form in which he stated Reynolds's typical eight-hour day could consist of sitting a total of five hours, standing a total of two hours, occasionally lifting, pushing, and pulling objects weighing up to 10 pounds; and occasionally climb, stoop, kneel, crouch, and crawl.  Sandberg also completed this form.  The restrictions were similar to those noted by Schreiber, but Sandberg noted that the limitations would be temporary.  As result, Lafayette approved Reynolds' application for First Stage LTD benefits and advised him that beginning March 10, 2006, the definition of total disability would

change to include his ability or inability to work in any occupation. Reynolds was also informed that he was to notify Lafayette if he began receiving Social Security disability benefits because that income could affect the amount of his LTD benefits.

Periodic medical examinations in 2004 showed Reynolds' medical issues had subsided. Most of the year was uneventful. Reynolds' medical exam reports mostly indicated normal functioning of his heart, lungs and overall systolic system. The only concern raised in the examinations came on October 1, 2004 when a CAT scan showed "possible constrictive Pericarditis." However, a subsequent exam showed Reynolds' heart, lung, and abdomen were normal.

2005 also proved to be relatively uneventful. Most of Reynolds' exams returned normal results for his heart and lung conditions. The most concerning evaluations came from Reynolds' doctor, Marc Dunn. Four evaluations made between May 2005 and October 2005 showed Reynolds had "interstitial lung disease and mild restrictive lung dysfunction." The evaluations also showed that Reynolds' lungs revealed no wheezes and that his heart was normal.

On November 10, 2005, Dr. Schreiber noted in another Physical Capacities Evaluation Form that Reynolds could sit, stand, and walk for up to four hours a day, during an eight-hour work day. On January 3, 2006, Dr. Sandberg submitted his version of the form, noting Reynolds was capable of sitting eight hours a day, and could stand and walk one hour each day.

### C.     Reynolds' Second Stage LTD Benefits Denied

In February 2006, Lafayette notified Reynolds that it was investigating to determine if he would qualify for Second Stage LTD benefits. An outside service called Reed Review Services was brought in to evaluate Reynolds' records. As part of this review, Dr. Leonard Sonne spoke

with Dr. Schreiber and Dr. Sandberg. Although it was clear that Reynolds had some trouble climbing stairs and walking on level surfaces, Dr. Sandberg stated that Reynolds was capable of full time sedentary work. Dr. Sonne's report stated the following:

> The claimant has pulmonary interstitial disease[3] with hilar and mediastinal adenopathy of an unknowen etiology. The condition is stable. On 9/21/05 the total lung capacity was normal at 93% of predicted. The diffusion capacity per total alveolar volume was also at 88% of predicted. The oxygen saturation on room air was 97% and was also normal. CAT scans of the chest have been unchanged. The left ventricular function and coronary arteries were normal. After the pericardiotomy an echocardiogram revealed no pericardial effusion. He had prostate cancer treated with surgery. He has poorly controlled diabetes.
>
> There is no objective documentation of any restriction, limitation or impairment that would preclude full-time sedentary, light or moderate work.

Dr. Sonne also conducted an employability analysis based on Reynolds' educational background, work history, and physical abilities. He determined that there are at least eight occupations that would allow Reynolds to transfer his skills and work in a full-time sedentary capacity.

On April 12, 2006, Lafayette informed Reynolds that he did not qualify for Second Stage LTD benefits. In doing so, Lafayette cited the medical reports submitted by Reynolds' doctors[4] and the opinion of Dr. Sonne. Lafayette also informed Reynolds that he had a right to appeal the decision.

Reynolds filed his appeal on May 8, 2006. In it, he complained for the first time that he suffered from atypical angina that made it difficult to determine if he was suffering a heart

---

[3]Pulmonary interstitial disease is the inflammation and eventual scarring of the lung tissue between the air sacs.

[4]The doctors were Drs. Dunn, Sandberg, and Schreiber.

5

attack. He also noted a litany of health issues including: constrictive pericarditis, steroid induced diabetes, pulmonary fibrosis, possible congestive heart failure and the onset of cancer.[5] In sum, Reynolds complained that he could not work a continuous eight-hour day because these conditions left him in chronic fatigue. Reynolds referred to a brief statement from Dr. Dunn which confirmed Reynolds' complaints; however, the letter did not refer to any test results or provide any other rational for these health problems. In fact., the statement contradicted Dr. Dunn's conclusions in October 2005 when Dr. Dunn examined Reynolds and found him in normal condition.

Lafayette's appeal specialist reviewed the appeal, and on September 26, 2006, denied it. She noted that (1) Reynolds was under the Second Stage LTD benefits requirements; (2) that Reynolds' treating physicians had examined him and offered opinions that indicated he was capable of full-time sedentary work; and (3) that Lafayette could identify a number of full time sedentary jobs that matched Reynolds' background and work history. The appeal decision also acknowledged the Social Security Administration's (SSA) decision to award Reynolds full time disability benefits but explained that Lafayette did not follow the SSA's decisions because it had different procedures and guidelines for determining disability.

D.    **Social Security Administration Disability Benefits**

As noted previously, Reynolds became eligible for SSA disability benefits. Joseph Houle who represented Reynolds in the SSA claim notified Lafayette of the decision to grant Reynolds' disability claim. As a result, the SSA awarded Reynolds $32,579.00 for disability benefits owed

---

[5]Reynolds does not mention what kind of cancer it is, but it may coincide with Dr. Sonne's evaluation which stated Reynolds had suffered from prostate cancer surgery.

6

to Reynolds for the period of June 2004 through August 2006. Pursuant to its policy, Lafayette informed Reynolds that the SSA decision to award him $32,579.00 for back disability payments meant Lafayette had overpaid Reynolds a net amount of $24, 691.00.[6] Reynolds acknowledged the overpayment and paid some of the money back almost immediately. He then set up a payment schedule of $820.47 each month but stopped making payments in January 2007, leaving a total unpaid balance of $17,450.50. Reynolds filed this lawsuit on July 24, 2007.

## II. STANDARD OF REVIEW

Reynolds is able to bring this suit under 29 U.S.C. § 1132(a)(1)(B) which allows him to pursue a civil action to recover benefits allegedly due to him under the terms of his plan. Since the plan gives the claim or plan administrator discretionary authority to construe and interpret the benefits plan, the standard of review is the arbitrary and capricious standard.[7] See Yeager v. Reliance Standard Ins. Co., 88 F.3d 376, 380-81 (6th Cir. 1996); Perez v. Aetna Life Ins. Co., 150 F.3d 550, 557 (6th Cir. 1998).

Under the arbitrary and capricious standard, the Court will uphold a benefits determination if it is "rational in light of the plan's provisions." University Hospital v. Emerson Electric Co., 202 F.3d 839, 846 (6th Cir. 2000). In other words, the court reviews to see if the explanation is reasoned and based on evidence. Davis v. Kentucky Finance Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1989). The Court inquires whether the decision to terminate benefits is based on substantial evidence and not half truths or lies. Bagsby v. Central States,

---

[6]This figure was an adjustment that reflected Reynolds' attorney fees spent in adjudicating the SSA claim.

[7]Plaintiff Reynolds concedes that the arbitrary and capricious standard applies to these motions.

Southeast & Southwest Areas Pension Fund, 162 F.3d 424, 429 (6th Cir. 1998). If the decision to deny disability benefits is supported by medical evidence, the decision cannot be arbitrary or capricious. Odenwaller v. Aetna Life Insurance Company, 1988 U.S. Dist. LEXIS 18023 (W.D. Mich. May 27, 1988).

### III.  ANALYSIS

Lafayette based their decision on several factors: (1) medical opinions that stated Reynolds could perform a full-time sedentary job; (2) Reynolds appeal was not supported by evidence; and (3) the SSA decision to grant disability is insufficient evidence to establish Second Stage disability under the LTD policy.

**A.  Medical opinions support Lafayette's decision to deny benefits.**

A review of the medical records supplied by Reynolds' own doctors and Dr. Sonne who performed an independent review of the medical records supports Lafayette's decision to terminate LTD benefits. First, Reynolds's treating physician, Dr. Sandberg, wrote in 2004 that Reynolds's limitations were temporary. Two years later, Dr. Sandberg's evaluation confirmed this when he indicated that Reynolds could sit for eight hours a day, stand and walk for an hour a day, and occasionally lift up to 20 pounds, conditions which support the notion that Reynolds could work in a sedentary full-time job. Reynolds's lung doctor, Dr. Dunn, repeatedly reported in 2005 that he believed Reynolds's lungs were clear and that his heart was normal. These reports included medical analysis of whether Reynolds was still afflicted with pericarditis and interstitial lung disease. The reports are clear that Reynolds is no longer restricted by pericarditis and his limitations from interstitial lung disease are minimal and controlled.

Dr. Sonne in his review concluded that there was nothing in the record to indicate

Reynolds was not able to work in a full-time sedentary occupation. The review was based on medical reports from Reynolds's own doctors who routinely stated in their evaluations that Reynolds's heart and lungs were normal.

The only hesitation over Reynolds's ability to work came from Reynolds's cardiologist, Dr. Schreiber. Dr. Schreiber stated that Reynolds had told him that he could not do anything and that he had shortness of breath when he walked or climbed steps. In other words, Dr. Schreiber relied on Reynolds's self reports. See <u>Leipzig v. AIG Life Insurance Company</u>, 362 F.3d 406-409 (7th Cir. 2004). Those reports stand in contrast to Dr. Schreiber' own medical evaluations which indicated overall improvement in Reynolds's ability to perform work related activities.

The medical evidence is substantial and at least gives Lafayette a reasonable inference that it could terminate Reynolds's benefits.

**B.     Dr. Dunn's statement in Reynolds's appeal is unsubstantiated.**

In his appeal, Reynolds cited a short statement from Dr. Dunn to support his contention that he was unable to work in any capacity. The opinion appears conclusory and baseless when compared to the four medical reports Dr. Dunn filed in 2005. Those reports which were based on Dr. Dunn's personal observations concluded that Reynolds's heart and abdomen were normal. Dr. Dunn found that Reynolds showed "mild restrictive dysfunction" in his pulmonary function and normal lung volumes.

The case law allows the claim administrator to disregard Dr. Dunn's unsupported statement in Reynolds's appeal and rely on the information that Dr. Dunn personally observed in his examinations. <u>Eastover Mining Co, v. Williams</u>, 338 F.3d 501, 513 (6th Cir. 2003)**;** <u>Noland v. Prudential Ins. Co.</u>, 2006 WL 1526087 (6th Cir. 2006). This is especially relevant when one

considers that the 2005 opinions of other treating physicians concurred with Dr. Dunn's 2005 opinions of Reynolds's health.

      **C.    The SSA decision to grant disability is not convincing evidence that Defendant Lafayette's termination of benefits was arbitrary and capricious.**

The Sixth Circuit provides clear instruction that Defendant Lafayette is not obligated to heed a SSA decision to grant disability. The failure of Lafayette to follow the SSA in granting Reynolds disability is not a reason for reversing Lafayette's decision to terminate Reynolds's benefits. Whitaker v. Hartfield Life and Accident Ins. Co., 404 F.3d 947, 949 (6th Cir. 2005)(held "that an ERISA plan administrator is not bound by an SSA disability determination when reviewing a claim for benefits under an ERISA plan" because Social Security benefits are often measured by different criteria than those used under an ERISA plan.)

## IV.   CONCLUSION

First, it is clear to me that Defendant Lafayette was not arbitrary and capricious when it decided to deny Reynolds LTD benefits. The decision was based on the medical opinions of both Reynolds's physicians and Lafayette's physician. Second, Defendant Lafayette's decision to deny Reynolds's appeal was not arbitrary and capricious since that decision was also reasoned and based on the medical opinions of physicians who personally attended to Reynolds, as opposed to an unsupported statement from Reynolds's lung doctor that was included in the appeal. Third, Defendant Lafayette did not err when it refused to be bound by the decision of the SSA to grant Reynolds disability benefits.

Finally, that leaves the question of whether Reynolds should reimburse Defendant Lafayette $17, 450.00 in overpayment of LTD benefits. He should reimburse Lafayette for the following reaons: (1) the LTD policy is clear that his LTD benefits were subject to other sources

of income, including SSA disability benefits; (2) when Reynolds advised Lafayette that he had received retroactive SSA disability benefits, he was informed by Lafayette that he owed it for overpayment of LTD benefits; and (3) Reynolds acknowledged that he would repay Lafayette for the overpayment and, in fact, began making those payments before he began this lawsuit.

For the reasons stated in this opinion, I GRANT Defendant Lafayette's Motion for Judgment on the Administrative Record; I DENY Plaintiff Reynolds's Cross Motion for Summary Judgment; and I ENTER a JUDGMENT against Plaintiff Reynolds on Defendant Lafayette's Counterclaim in the amount of $17,450.00.

**IT IS SO ORDERED.**

Date:    March 28, 2008              s/John Feikens
                                     United States District Judge

|  |
|---|
| Proof of Service |
| I hereby certify that the foregoing order was served on the attorneys/parties of record on March 28, 2008 by U.S. first class mail or electronic means. |
| s/Carol Cohron<br>Case Manager |